**COMMONWEALTH of Pennsylvania,**
**Appellee,**

v.

**Robert RIVERA, Appellant.**

Superior Court of Pennsylvania.

Argued Feb. 5, 2003.
Filed June 20, 2003.
Revised Aug. 18, 2003.

G. Guy Smith, Media, for appellant.

Michelle P. Hutton, Asst. Dist. Atty., Media, for Com., appellee.

BEFORE: ORIE MELVIN, BOWES and BECK, JJ.

OPINION BY BECK, J.:

¶ 1 In this appeal from the judgment of sentence for second degree murder, we consider the kidnapping statute[1] in the context of a parent/defendant and in light of the law prohibiting interference with child custody.[2] After careful consideration of these facts and the applicable law, we conclude that a parent may be convicted of kidnapping his own child under 18 Pa. C.S.A. § 2901(a)(3). We also consider appellant's other challenges on appeal, including his claim that the Commonwealth failed to establish the *corpus delicti.* We affirm.

*FACTS*

¶ 2 Robert Rivera and Jennifer Helton began dating in 1996 and soon became engaged. The couple's relationship was a stormy one and in 1998, shortly before their daughter Katelyn was born, Rivera began beating Helton. The couple lived with their child in Upper Chichester, but Helton sought refuge at her parents' home in Boothwyn when Rivera became abusive.

¶ 3 In July 1999, Rivera destroyed the couple's apartment, beat Helton severely and would not let her leave. Helton ultimately escaped and filed charges against Rivera. She also obtained a Protection From Abuse (PFA) Order, which granted her sole custody of Katelyn and provided that Rivera was to have no contact with Helton or Katelyn with the exception of brief visitation supervised by Helton's mother.

¶ 4 On August 10, 1999, Helton went to a Delaware County district court in Linwood in connection with the assault charges she filed against Rivera. After the hearing, at which Rivera was bound over for court, Rivera confronted Helton at a local convenience store. In the parking lot, he beat her and dragged her by her hair and throat. A passer-by intervened and Rivera fled in a car that he had borrowed that morning. Helton went to the hospital for treatment of her injuries.

¶ 5 From the convenience store, Rivera drove directly to Katelyn's daycare residence that was located nearby. The caregiver saw Rivera approaching and locked her doors.[3] Rivera broke into the house and forcibly removed the child, despite the caregiver's protests and her attempts to prevent him from doing so.

¶ 6 For the next several hours, Rivera kept the child in his car and attempted to make contact with Helton. In a series of telephone calls to Helton and others, Rivera repeated his demand to meet with Helton and threatened her that if she refused she would never see the child again. Throughout the afternoon and evening,

---

1. 18 Pa.C.S.A. § 2901.

2. 18 Pa.C.S.A. § 2904.

3. The caregiver knew that Rivera was not permitted custody of his daughter.

Rivera drove around with Katelyn and stopped to make telephone calls. During that time, he spoke to Helton, police officers and a public assistance employee. He also met with Michelle Lupi, the woman whose car he was driving.[4] Rivera abandoned several of his attempts at meeting Helton when he saw that she was accompanied by police. Each time, Rivera became angrier and his calls to Helton became more desperate. Even though police were present at some of the arranged meetings, Rivera drove off before he could be apprehended.

¶7 Despite the efforts of Helton and police, Rivera never returned Katelyn to her mother. The last known sighting of Rivera and the little girl together occurred at a gas station in Chadds Ford shortly after 7:00 PM. An employee at the station, John McCabe, saw Rivera in Lupi's car when Rivera stopped and bought two dollars worth of gas. Katelyn was sitting in the front seat of the car.

¶8 Two hours later, Rivera returned to the same gas station and used the bathroom. This time, Katelyn was not in the car. Rivera told McCabe that he had no money, but was willing to give McCabe his watch in exchange for gasoline. Rivera identified himself as Rob and told McCabe he would be back to return the money and retrieve his watch.

¶9 Less than two hours later, Rivera arrived at the rural Maryland home of a previous neighbor, Thomas Whittaker. The two men drank together in Whittaker's boathouse, where Whittaker kept his tools. Rivera asked Whittaker if he could spend the night and Whittaker agreed. After Rivera spent the night on the couch, he left abruptly in the morning without saying goodbye. Later, Whittaker noticed that the door to his boathouse was open and a spade shovel that had been inside was missing.

¶10 Rivera contacted Helton again that day and told her that he had given Katelyn to a woman who lost her baby. He claimed that Katelyn was "in a better place" and offered to take Helton to the child. Again, Rivera tried to meet with Helton; each time he grew angrier because Helton contacted police. Ultimately, police apprehended Rivera driving away from Helton's family home.

¶11 Following his arrest, Rivera told police that he had given Katelyn to a woman, but would not elaborate. Police allowed Rivera to meet with Helton for a brief period, but still Rivera would not explain what he had done with the child. He told Helton that she would never see Katelyn again and he told police that the child was in upstate New York. Later, in conversations with a county investigator and an FBI agent, Rivera confirmed his presence at the gas station with McCabe and claimed that he had given Katelyn to woman at nearby Longwood Gardens. He repeated this claim to his mother and another witness.

¶12 After Rivera was incarcerated, he told a fellow inmate, William Lively, a different version of events. First he said that the Longwood Gardens transfer did not occur and that he had given the child to someone he trusted. Later, Rivera told Lively that he killed his daughter by suffocating her. He stated that he removed Katelyn's clothes in order to make it difficult to identify her and to insure that her body decayed quicker. He said that he

---

4. In the early evening Rivera picked up Lupi at her workplace in Essington and she stayed in the car with him and Katelyn as he tried to make contact with Helton. After Rivera's failed attempt to meet Helton at her parents house, Lupi, who described Rivera as upset, angry and driving dangerously, asked to be let out of the car. Rivera obliged.

discarded the clothes on Route 202. Rivera also told Lively that he used Whittaker's shovel to dig the hole in which he buried Katelyn's body and he explained that he left the shovel at a construction site near Whittaker's property. Rivera also made a map for Lively in an effort to show the location of the body and he instructed Lively to tell his lawyer that Whittaker committed the crime. Lively reported all of this information to police.

¶ 13 Meanwhile, an extensive search for the child ensued. Contacts with Rivera's family in New York and Puerto Rico proved fruitless. Police and volunteers combed the area around the gas station, the area around Whittaker's property and the areas in between those two locations. Although police never recovered Katelyn's body, they did find some of her clothes on a highway median on Route 202. They also found Whittaker's shovel at a Maryland construction site not far from his home.

¶ 14 Rivera's comments to others did not stop with Lively. He spoke with police again and said that if he revealed Katelyn's whereabouts, he would spend the rest of his life in prison. He also wrote to the local newspaper, stating that he was the only person who knew where Katelyn was located. Finally, Rivera sent dozens of letters to Helton while he was incarcerated and awaiting trial. Along with birthday and holiday cards addressed to the child, Rivera sent Helton a clipping that advertised an episode of a television show, the subject of which was a murder without a body or any evidence.

¶ 15 At trial on murder charges, Rivera testified on his own behalf. He admitted taking the child and contacting Helton throughout the day. With respect to what happened next, Rivera simply stated "everybody else knows what happened." On cross-examination, when asked where Ka-telyn was, he responded "I did not kill her." Rivera admitted that he told Helton that Katelyn was going to heaven. He also admitted that his statements about giving the child to a woman at Longwood Gardens and a person in New York were untrue. He denied stealing Whittaker's shovel and said that the clothing found on the highway either did not belong to Katelyn or she was not wearing it on the date she disappeared.

¶ 16 The jury convicted Rivera of second degree (felony) murder, kidnapping, burglary and interference with custody. He was sentenced to life in prison. This appeal followed.

### KIDNAPPING

¶ 17 On appeal, Rivera claims first that the felony underlying his murder charge, kidnapping, cannot be sustained because it is impossible for a parent to kidnap his own child. According to Rivera, both his kidnapping conviction and the second degree murder conviction upon which it is based must be reversed.

¶ 18 The kidnapping statute provides:

(a) Offense defined.—A person is guilty of kidnapping if he unlawfully removes another a substantial distance under the circumstances from the place where he is found or if he unlawfully confines another for a substantial period in a place of isolation, with any of the following intentions:

1) To hold for ransom, or as a shield or hostage.

2) To facilitate commission of any felony or flight thereafter.

3) To inflict bodily injury on or to terrorize the victim or another.

4) To interfere with the performance by public officials of any governmental or political function.

(b) Grading.—Kidnapping is a felony of the first degree. A removal or confinement is unlawful within the meaning of this section if it is accomplished by force, threat or deception, or, in the case of a person who is under the age of 14 years or an incapacitated person, if it is accomplished without the consent of a parent, guardian or other person responsible for general supervision of his welfare.

18 Pa.C.S.A § 2901.

¶ 19 Rivera was convicted of § 2901(a)(3), kidnapping with the intent to inflict bodily injury or terrorize the victim or another. He relies on two cases decided in the late 1800s that stand for the proposition that a parent cannot be convicted of kidnapping his own child. *See Commonwealth v. Myers,* 146 Pa. 24, 23 A. 164 (1892); *Burns. v. Commonwealth,* 129 Pa. 138, 18 A. 756 (1889). Both cases direct that the kidnapping statute does not envision application against a parent. The cases address the actions of a parent who removed his children from the custody and care of the other parent and kept them in his own care. The *Burns* court explained that the kidnapping statute was not intended to "prohibit one parent from asserting a claim to the possession of his or her child against the will, and to the exclusion, of the other." *Burns,* 129 Pa. at 145–46, 18 A. at 757.

¶ 20 As the facts above reflect, this case is not one in which Rivera removed Katelyn from her mother's custody in his claim for custody or "possession" of the child. Rather, it is clear from all of the evidence that Rivera became enraged at Helton and so forcibly seized Katelyn from her child care provider, held her (despite a court order that denied him such custody) and used her to terrorize Helton throughout the day.

¶ 21 The existence of the PFA Order, the manner in which Rivera took his daughter, the purpose for which he took the child and the conduct he exhibited during the incident all militate in favor of applying the kidnapping statute to this case. Further, not only were the facts in *Myers* and *Burns* different from those here, but the statute at issue in those cases was different as well. Over seventy years after these two cases were decided, Pennsylvania adopted the Model Penal Code, from which the relevant kidnapping statute was taken. *Commonwealth . v. Barfield,* 768 A.2d 343 (Pa.Super.2001). The current law plainly provides that any "person" may be convicted of kidnapping; it does not exempt a parent. 18 Pa.C.S.A. § 2901(a).

¶ 22 Rivera argues that despite the broad language of § 2901, the legislature did not intend to expose a parent to liability for kidnapping. He directs our attention to another law, Interference with Custody of Children, 18 Pa.C.S.A. § 2904. Rivera argues that the existence of § 2904 proves that the legislature did not intend § 2901 to apply to parents. He claims that only § 2904 was meant to address case like his, *i.e.,* those instances in which a parent takes possession of his child in violation of a court order. Rivera relies on *Barfield* to support his claim.

¶ 23 In *Barfield,* a mother failed to return her children to the custody of their foster parent at the end of the mother's court-ordered, weekend visitation. The mother told a caseworker that she had placed the children with a religious group. When the children could not be located, the mother was charged with kidnapping and interference with the custody of children. The trial court granted judgment of acquittal on the kidnapping charges and a panel of this court affirmed.

¶ 24 *Barfield* did not address § 2901(a)(3), kidnapping with the intent to cause bodily harm or terrorize. Instead, the *Barfield* court analyzed § 2901(a)(4), kidnapping with the intent to interfere with public officials or governmental function. The court framed the question on appeal narrowly:

> The sole question presented is whether the trial court erred as a matter of law in determining that § 2901(a)(4) of the kidnapping statute was not intended to address a situation where a non-custodial parent removes her children from the custody of a social service agency in violation of a court ordered placement plan.

*Id.* at 344.

¶ 25 In analyzing the question, the *Barfield* court considered the purposes underlying § 2901(a)(4) of the kidnapping statute and the custody interference statute. The court reasoned that if § 2901(a)(4) applied to parents who simply removed their children from a lawful custodian, then the custody interference statute, § 2904, "would become superfluous." *Id.* at 346. Instead, reasoned the *Barfield* court, it is the law prohibiting interference with custody that applies when a parent acts in contravention of a custody order, not the kidnapping statute. *Id.*

¶ 26 Because *Barfield* addressed an entirely different subsection of the kidnapping statute than that charged here, and because the conduct at issue in *Barfield* was different as well, we conclude that *Barfield* does not entitle Rivera to relief. Further, not only does *Barfield* fail to support Rivera's claim, it also sets out a reasoned analysis of why Rivera's conduct *is* punishable under the kidnapping statute.

¶ 27 The *Barfield* court recognized that the American Law Institute released its final draft of the Model Penal Code (MPC) in 1962 and in the following decade Pennsylvania, along with many other states, "structured much of its Crimes Code in accordance" with the MPC, including the kidnapping statute. *Id.* at 347. The *Barfield* court discussed the rationale for both kidnapping and interference with custody of children:

> Moreover, in promulgating § 2904 [interference with the custody of children] Pennsylvania followed the lead of the Model Penal Code and removed from the general crimes of kidnapping the special case of custodial interference. The rationale that is offered to support this special treatment is twofold. First, "the interest protected is not freedom from physical danger or terrorization by abduction, [since that is adequately covered by § 2901 [kidnapping]], . . . but rather the maintenance of parental custody against all unlawful interruption . . . ." ALI, Model Penal Code and Commentaries, part II § 212.4, comment 2(a). The conduct is further distinguishable from kidnapping by the fact the defendant is usually a parent or other relative who is favorably disposed toward the child and does not think of his action as harmful to the child. *Id.* Thus, a less severe sanction for this type of conduct is warranted. Clearly the drafters of our present Crimes Code intended to differentiate between the varying types of unlawful removal and restraint based upon the degrees of harm potentially involved with such actions.

*Id.* at 347–48 (footnote omitted).

¶ 28 We need not discuss how very different this case is from that of the parent who disagrees with a custody order and so acts in contravention of it. Nor need we expound on the very grave degree of harm present here. The facts presented at trial establish that Rivera's purpose

was to seize his daughter and proceed to threaten danger and death upon her in an effort to coerce, manipulate and terrorize her mother. The facts of this case present far more than mere "interference" with custody.

¶ 29 In light of the facts present here, we expressly adopt the *Barfield* language excerpted above and reach several conclusions based on its rationale. First, *Myers* and *Burns* do not control this case because they addressed the Pennsylvania kidnapping statute in effect before adoption of the Model Penal Code.[5] Second, the current Pennsylvania kidnapping statute, which is substantially similar to the Model Penal Code's version, does not expressly preclude a parent from being charged with kidnapping. Third, the Interference with Custody of Children statute is not the only law that applied to Rivera's conduct because in addition to removing his daughter in contravention of a court order, he removed the child with the intent to harm or terrorize her mother. Therefore, he violated § 2901(a)(3).

¶ 30 Under the facts of this case, Rivera's status as biological father of the victim does not preclude his conviction for kidnapping under 18 Pa.C.S.A. § 2901(a)(3). Similarly, the fact that kidnapping constituted the underlying felony for Rivera's felony murder conviction was not error.

### PRIOR BAD ACTS

¶ 31 Rivera's next claim of error is that the trial court improperly admitted evidence of his other crimes, namely, the repeated acts of violence he committed against Helton leading up to the day he kidnapped Katelyn. Rivera argues that

this conduct was "not even directed at the alleged victim" and, as a result, its prejudicial impact exceeded its probative value. We cannot agree.

¶ 32 The admission of evidence is left to the sound discretion of the trial court. *Commonwealth v. Stallworth*, 566 Pa. 349, 781 A.2d 110 (2001). Rivera concedes that while evidence of other crimes ordinarily is inadmissible to prove guilt, such evidence is admissible when offered to establish motive or intent. Pa.R.E. 404(b)(2). However, the probative value of the evidence must outweigh its prejudicial impact. Pa. R.E. 404(b)(3).

¶ 33 Contrary to Rivera's claim, the fact that the prior criminal conduct was visited upon a victim other than the one at trial does not preclude admission of the evidence. All that is required is that the prior conduct tend to establish motive or intent for the conduct in issue at trial. Pa.R.E. 404(b); *Commonwealth v. Smith*, 544 Pa. 219, 675 A.2d 1221 (1996), *cert. denied*, 519 U.S. 1153, 117 S.Ct. 1090, 137 L.Ed.2d 223 (1997); *Commonwealth v. Pacell*, 345 Pa.Super. 203, 497 A.2d 1375 (1985). Rivera appears to concede this fact when he argues that "the testimony . . . fails to provide the necessary nexus to permit the introduction of such highly inflammatory and clearly prejudicial information." Appellant's Brief at 16.

¶ 34 The nexus between Rivera's acts of violence on Helton and his seizure of Katelyn could not be clearer. Rivera's prior threats to hurt and kill Helton, coupled with his frequent assaults upon her, were directly connected to the kidnapping. Rivera abducted Katelyn immediately after his final assault on Helton at the conve-

---

5. "Prior to the enactment of § 2901 Pennsylvania statutes only applied to abductions in which the abductor intended 'to extort money or other valuable thing' or in the case of a

child ten years or under, with the intent to conceal or detain such child or steal anything from him." *Barfield*, 768 A.2d at 346 (citing 18 P.S. §§ 4723 & 4725).

nience store parking lot. For hours thereafter, he threatened Helton, using the child—and the risk to her life—as a means to coerce Helton into meeting with him.

¶ 35 Rivera's prior acts of violence against Helton were admissible to show motive and intent.[6] Further, although the evidence certainly was prejudicial, it was highly probative and so admissible.

¶ 36 The prior bad acts also were admissible because they formed the sequence of events and natural history of this case. *Commonwealth v. Spotz*, 562 Pa. 498, 756 A.2d 1139 (2000), *cert. denied*, 534 U.S. 1104, 122 S.Ct. 902, 151 L.Ed.2d 871 (2002). Rivera's increasing hostility toward Helton culminated in his kidnapping of Katelyn on the very day he was held for court for assaulting Helton. His prior conduct was relevant to place the entire incident in context. There was no error in admitting the prior acts.

### COMMENTS REGARDING RIVERA'S POST ARREST SILENCE

 ¶ 37 Rivera next challenges the trial court's refusal to grant a mistrial after a Commonwealth witness, Charles Pickett of the National Center for Missing and Exploited Children, testified that Rivera did not contact the Center after the kidnapping. According to Rivera, Pickett's testimony constituted a comment on Rivera's post-arrest silence, warranting the grant of a new trial. Rivera argues that Pickett's testimony was particularly damaging be-

cause it came after Commonwealth witness Detective Reardon testified that although Rivera spoke to police after his arrest, he would not reveal Katelyn's whereabouts.[7]

 ¶ 38 We review the denial of a mistrial in light of the trial court's sound discretion and reverse only where we conclude that discretion has been abused. *Commonwealth v. Pearson*, 454 Pa.Super. 313, 685 A.2d 551, 554 (1996) (*en banc*). The law is clear that the prosecution may not highlight or comment upon a criminal defendant's decision to remain silent following his arrest. *Commonwealth v. Johnson*, 788 A.2d 985, 988 (Pa.Super.2001). However, a prompt and adequate instruction by the trial court can cure such an error. *Pearson*, 685 A.2d at 554.

¶ 39 Here, although the trial court refused to grant the mistrial, it did instruct the jury that it was not to consider the fact that Rivera failed to contact Pickett's organization. The court struck the testimony and reminded the jurors that Rivera had an absolute right to remain silent once arrested and the fact that he chose silence could not be used as evidence against him.[8]

 ¶ 40 In determining whether the court's instruction to the jury is sufficient, we are to consider a number of factors, namely, "1) the nature of the reference to the accused's silence, 2) how it was elicited, 3) whether the district attorney exploited

---

**6.** We observe that the evidence was admitted only after the Commonwealth notified Rivera of its intent to offer it and following pretrial consideration by the court. Further, the trial court instructed the jury (both at the time the evidence was admitted and at the conclusion of the case) that the evidence was to be used only for the limited purpose of establishing motive.

**7.** Detective Reardon also told the jury that following Rivera's invocation of rights, police

allowed him to speak with Helton in exchange for learning where Katelyn was located. However, after the meeting, Rivera would not explain what he had done with Katelyn. At defense counsel's request, the court cautioned the jury that Reardon's references to Rivera's refusal to tell police where Katelyn was could not be used against him.

**8.** The court repeated a similar instruction at the close of the case.

it, and 4) the promptness and adequacy of the cautionary instruction." *Pearson,* 685 A.2d at 554 (citing *Commonwealth v. Mays,* 361 Pa.Super. 554, 523 A.2d 357, 359,, *appeal denied,* 516 Pa. 613, 531 A.2d 780 ((1987))).

¶ 41 Preliminarily, we note that this case presents unusual circumstances. First, the reference complained of does not involve Rivera's assertion of his right to remain silent in the face of police questioning. Rather, it involves Rivera's failure to contact a missing persons agency about his daughter. Second, this is not a case in which the appellant exercised his right to remain silent following his arrest. Rivera, after being informed of his rights, told police he was willing to talk to them. In doing so, he stated that he would not reveal the child's whereabouts. Throughout his conversations with police, Rivera recited various versions of the events of that day. He said that Katelyn was safe, that she was with people in New York and that he would never reveal her location, but would "take it to his grave." He asked to see Helton and agreed that if police granted his request he would tell them what he had done with his daughter.[9]

¶ 42 Recognizing that these circumstances differ from most cases involving an accused's right to remain silent, we nonetheless proceed to assess the impact of Pickett's testimony and the efficacy of the court's instruction under the *Pearson* standard. We find that the nature of Pickett's reference was minimal and the manner in which it was elicited was brief. Further, the prosecutor did not exploit the reference. Finally, the trial judge issued a prompt instruction cautioning the jury not to consider the reference. We conclude that any impropriety in Pickett's testimony

was cured by the trial court's instruction. Under *Pearson,* there was no reversible error.

### CORPUS DELICTI

¶ 43 Rivera's final claim concerns the *corpus delicti.* He insists that the Commonwealth failed to establish that Katelyn was dead as it offered no body, no weapon, no blood, no DNA and no eyewitnesses. As a result, Rivera argues, the Commonwealth should not have been permitted to offer certain of his statements at trial.

¶ 44 The *corpus delicti* rule is designed to guard against the "hasty and unguarded character which is often attached to confessions and admissions and the consequent danger of a conviction where no crime has in fact been committed." *Commonwealth v. McMullen,* 545 Pa. 361, 681 A.2d 717, 720 (1996).

> The *corpus delicti* rule is a rule of evidence. Our standard of review on appeals challenging an evidentiary ruling of the trial court is limited to a determination of whether the trial court abused its discretion. The *corpus delicti* rule places the burden on the prosecution to establish that a crime has actually occurred before a confession or admission of the accused connecting him to the crime can be admitted. The *corpus delicti* is literally the body of the crime; it consists of proof that a loss or injury has occurred as a result of the criminal conduct of someone. The criminal responsibility of the accused for the loss or injury is not a component of the rule. The historical purpose of the rule is to prevent a conviction based solely upon a confession or admission, where in fact no crime has been committed. The *corpus*

---

9. In addition to these conversations with police, Rivera made many other statements following his arrest, to a variety of people. He spoke to William Lively, he wrote to the local newspaper and he sent Helton numerous cards and letters.

*delicti* may be established by circumstantial evidence.

*Commonwealth v. Verticelli,* 550 Pa. 435, 441, 706 A.2d 820, 822–23 (1998) (citations omitted).[10]

¶ 45 Although Rivera does not pinpoint the specific statements he claims were inadmissible, we will assume that he is challenging his confession to Lively, specifically the statements he made after his arrest that inculpated him in the murder of Katelyn. *See Verticelli,* 550 Pa. at 444, 706 A.2d at 823 (*corpus delicti* rule does not apply to all statements of an accused, only those that are inculpatory of the crime at issue).[11] According to Lively, Rivera told him that he removed Katelyn's clothes and threw them on the highway, that he killed Katelyn by suffocating her and that he buried Katelyn's body using a shovel he took from Whittaker's residence.

¶ 46 Under the *corpus delicti* rule, the Commonwealth was required to show, either through direct or circumstantial evidence, that Katelyn was dead and that her death was the result of criminal means. Only if the Commonwealth could establish these facts was admission and consideration of these statements proper. *See Reyes, supra.*

¶ 47 Contrary to Rivera's position in his brief, there is no requirement that the Commonwealth produce a dead body in a homicide case. *Commonwealth v. Smith,* 523 Pa. 577, 568 A.2d 600, *reversed on other grounds,* 532 Pa. 177, 615 A.2d 321 (1989); *Commonwealth v. Burns,* 409 Pa. 619, 187 A.2d 552 (1963); *Commonwealth v. Lettrich,* 346 Pa. 497, 31 A.2d 155 (1943). Likewise, the absence of a weapon, blood or DNA is not fatal to the Commonwealth's case, nor is the lack of eyewitnesses; the *corpus delicti* may be established by circumstantial evidence. *Verticelli, supra.*

¶ 48 Here the Commonwealth presented evidence that a twenty-month-old child, who obviously could not fend for herself, disappeared after Rivera kidnapped her. In addition to the very significant fact of the victim's age and incapacity, there are numerous other facts that support the conclusion that the child is dead.

¶ 49 Police discovered articles of her clothing in the area where Rivera traveled on the night of the abduction. Rivera had access to Whittaker's boathouse, which, after Rivera's abrupt departure, Whittaker realized had been opened and from which a shovel had been removed. Police recovered the shovel at a nearby construction site. Extensive search efforts by volun-

---

**10.** Establishing the *corpus delicti* in Pennsylvania is a two-step process. The first step concerns the trial judge's *admission* of the accused's statements and the second step concerns the fact finder's *consideration* of those statements. In order for the statement to be admitted, the Commonwealth must prove the *corpus delicti* by a preponderance of the evidence. In order for the statement to be considered by the fact finder, the Commonwealth must establish the *corpus delicti* beyond a reasonable doubt. *Commonwealth v. Reyes,* 545 Pa. 374, 681 A.2d 724 (1996), *cert. denied,* 520 U.S. 1174, 117 S.Ct. 1445, 137 L.Ed.2d 551 (1997). *See Commonwealth v. Persichini,* 558 Pa. 449, 737 A.2d 1208, 1210–11 (1999) (Castille, J., opinion in support of affirmance)

(describing Pennsylvania's two-tiered approach to the *corpus delicti* rule as "problematic" and explaining that Louisiana is the only other state with such an approach).

**11.** In his brief, Rivera states that we should remove all of his statements, "good and bad," to determine if what is left constitutes the *corpus delicti.* The law is clear that his suggestion is incorrect. *Verticelli, supra.* As we explain *infra,* there are many statements made by Rivera that are not subject to the *corpus delicti* rule and so may be considered in determining whether Katelyn is dead and her death was the result of criminal means.

teer organizations, local police and the FBI all were unsuccessful in recovering the child. These facts tend to establish that Katelyn is dead and her death occurred by criminal, rather than accidental, means. *See Burns, supra; Lettrich, supra.*

 ¶ 50 Further, in considering whether the evidence is sufficient to establish death by criminal means, we cannot ignore the conduct of Rivera prior to the murder and the statements he made to Helton, police and others that day. All afternoon and evening, Rivera used his daughter as a pawn to meet with Helton. Each time their meeting failed, he became more and more angry. In his phone calls, Rivera threatened to harm Katelyn. He stated that he was taking the child to a place where no one could hurt her again. He said Katelyn was going to heaven. He told Helton that she should "say goodbye" to her daughter.

¶ 51 These statements are not statements subject to the *corpus delicti* rule. Indeed, Katelyn was alive at the time they were uttered; there had been no murder. Rather, the statements were prior threats and statements of intent, neither of which fall within the rule that protects against disclosure of "hasty and unguarded confessions." *See Verticelli* (narrowing the breadth of the *corpus delicti* rule to include only those statements that inculpate the defendant in the crime). Rivera's violent abduction of Katelyn, his cruel conduct on the day she disappeared and his repeated threats regarding her safety are directly relevant to the question of whether Katelyn is dead and how her death was accomplished.

¶ 52 Relevant too is Rivera's varying and inconsistent statements about what happened to Katelyn (none of them inculpating him in murder), followed by his own testimony at trial. He told the jury that

his initial story about giving the child to a woman at Longwood Gardens was untrue, as was his claim that the child was with a woman from New York. *See Lettrich, supra* (evidence of *corpus delicti* sufficient where baby, incapable of caring for herself, was last seen alive with the defendant, who gave inconsistent statements explaining her disappearance).

¶ 53 We conclude that the Commonwealth established the *corpus delicti* beyond a reasonable doubt; thus, Rivera's confession was admissible and the jury properly considered it in reaching its verdict.

### CONCLUSION

¶ 54 Because we find that Rivera raises no issues that entitle him to appellate relief, we must affirm his sentence.

¶ 55 Judgment of sentence affirmed.