J-S43006-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| FRANKLIN ANDREW | : | |
| | : | |
| Appellant | : | No. 2861 EDA 2023 |

Appeal from the Judgment of Sentence Entered August 4, 2023
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0003063-2022

BEFORE: BOWES, J., STABILE, J., and KUNSELMAN, J.

MEMORANDUM BY BOWES, J.:                    **FILED JANUARY 10, 2025**

Franklin Andrew appeals from the judgment of sentence of life imprisonment without the possibility of parole after a jury convicted him of first-degree murder and related offenses. We affirm.

The trial court provided the following recitation of the underlying facts in this case:

> Lauren McKiver began dating [Appellant] in February of 2021. By late August, Ms. McKiver's relationship with [Appellant] "wasn't going well," and the couple was having fights over [Appellant] not trusting Ms. McKiver with other men. One night in August, just a few days before the decedent's murder, [Appellant] texted [her] using a fake number, posing as someone else. [She] initially responded to the texts from the fake number, but when [Appellant] asked Ms. McKiver if she had a boyfriend, she did not answer the question. [Appellant] called [Ms.] McKiver, telling her to come outside of her home. Ms. McKiver went outside to meet [Appellant], and after she denied talking to anyone else, [he] slammed her head through the back windshield of his car and took her phone overnight.

On August 28, 2021, Ms. McKiver reached out to [Appellant] to come to her house on Paul Street in the Kensington neighborhood of Philadelphia so she could give him money to repair his windshield. Sometime after 3 p.m., [Appellant] arrived to Ms. McKiver's house, and the pair spent about one hour together in and around Ms. McKiver's home before eventually parting ways. After she left [Appellant], Ms. McKiver reached out to her close friend Khalil Smith, and asked him to meet her so she could "vent" about [Appellant]. Ms. McKiver and Mr. Smith had been friends since [she] was [thirteen] years old[,] and they had been romantically involved in the past. [Appellant] was "extremely jealous of Khalil," and expressed to Ms. McKiver on previous occasions that he felt she should not have a friendship with him.

Mr. Smith met Ms. McKiver on an empty porch at 4204 Salem Street, which was about a block away from [her] home, within an hour after she left [Appellant]. After Mr. Smith arrived, he left briefly to go to a nearby store to get a lighter, and then came back to the porch. Once [he] returned, the pair smoked and talked for about half an hour before [Appellant] unexpectedly showed up. As soon as [Appellant] arrived, he approached Ms. McKiver and Mr. Smith, and without a word, shot Mr. Smith in the head. After [Appellant] shot Mr. Smith, Ms. McKiver immediately ran down the block towards her house. While running, she dropped her phone towards the end of the block, and [Appellant] caught up to her while she bent over to pick it up. At this point, [Appellant] insisted that she come into her house with him, which she did.

Shortly after the shooting, around 6:00 p.m., Philadelphia police arrived at the crime scene on Salem Street. Police observed Mr. Smith laying on the sidewalk with blood coming from his head. Police did not observe any signs of life. Medics arrived, and Mr. Smith was pronounced dead at the scene at 6:24 p.m. The medical examiner determined that Mr. Smith's cause of death was a gunshot wound to the head, and his manner of death was homicide.

Trial Court Opinion, 1/25/24, at 3-4 (citations omitted, titles supplied).

During the ensuing investigation, officers recovered surveillance footage from various points around the area. While it did not capture the shooting, it did depict the actions of Appellant, Ms. McKiver, and Mr. Smith in the

immediate vicinity before and after the shooting. That included, *inter alia*, the entrance to Ms. McKiver's home, a local store, the street perpendicular to where Mr. Smith was killed, and the lot where Appellant discarded the firearm.

Detectives interviewed Ms. McKiver. She first told police that someone other than Appellant committed the murder. However, she ultimately explained that Appellant had coached her on that story, and she then implicated Appellant in the murder. After doing so, she received threats and was relocated through a witness protection program. At the preliminary hearing, she divulged more information about witnessing the shooting and the extent of her relationship with Appellant.

Ms. McKiver testified at Appellant's jury trial consistent with the above recitation. She also acknowledged that she had initially lied to police. Among other evidence, the jury watched a video compiled from the various surveillance vantage points. Notably, it portrayed an individual throwing an object over a fence and, upon investigation, police found a firearm at that location. Forensic testing confirmed that the recovered firearm discharged both the bullet fragment recovered by the medical examiner's office and the fired cartridge casing found at the scene.

The jury found Appellant guilty of first-degree murder, carrying a firearm without a license, carrying a firearm in public in Philadelphia, and possession of an instrument of crime. The trial court sentenced him to life imprisonment without the possibility of parole for first-degree murder, and concurrent terms of incarceration of two to seven years, nine months to five

years, and one month to five years, respectively, for the remaining convictions.

Appellant timely filed a post-sentence motion challenging the sufficiency and weight of the evidence. The court denied the motion and this timely appeal followed. Appellant complied with the court's order to file a Pa.R.A.P. 1925(b) statement, and the court submitted a Rule 1925(a) opinion addressing his claims of error. In this Court, Appellant raises the following issues for our consideration:

1. Whether the verdict was contrary to the weight of the evidence and the convictions for [all crimes] cannot stand because the Commonwealth did not present credible evidence to identify [Appellant] as the shooter, nor did they present credible evidence that he possessed a gun?

2. Whether the video purporting to show [Appellant] in a store and on the streets surrounding the location of the crime scene was in fact [Appellant]?

3. Whether the witness, [Ms.] McKiver, who identified [Appellant] as the murderer[,] was credible and worthy of belief as she was a corrupted source?

4. Whether the video purporting to show [Appellant] in a store and on the streets surrounding the location of the crime scene illustrate [Appellant] was carrying a firearm?

Appellant's brief at 4.

As noted by the trial court, these four issues all pertain to the weight of the evidence.[1] Accordingly, we conduct our review cognizant of the following principles:

> A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice. It has often been stated that a new trial should be awarded when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail.
>
> An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court:
>
> Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict

---

[1] Appellant clearly recognized that these claims are interrelated as he only presented a single argument section challenging the weight of the evidence. We remind counsel that the number of questions raised should match the arguments presented. **See** Pa.R.A.P. 2119(a) ("The argument shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part--in distinctive type or in type distinctively displayed--the particular point treated therein, followed by such discussion and citation of authorities as are deemed pertinent.").

was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

*Commonwealth v. Dewald*, 317 A.3d 1020, 1037 (Pa.Super. 2024) (cleaned up).

Altogether, Appellant maintains that his convictions were against the weight of the evidence because the Commonwealth did not prove that he was the shooter or that he possessed a firearm.[2] His argument is threefold: (1) he is not the individual in the video; (2) Ms. McKiver's testimony was not credible because she admitted to lying; and (3) the comparison of Appellant's DNA to that recovered from the gun yielded inconclusive results. *See* Appellant's brief at 9.

The trial court, in assessing Appellant's weight claim, determined that the verdicts "were completely supported by the Commonwealth's compelling evidence and in no way shocked the conscience of the court." Trial Court Opinion, 1/25/24, at 14. Further, it astutely addressed Appellant's tripartite arguments thusly:

_____

[2] We provide the following definitions of the crimes for which Appellant was convicted and for which he claims the verdict was unsupported by the weight of the evidence. First, "[a] criminal homicide constitutes murder of the first degree when it is committed by an intentional killing." 18 Pa.C.S. § 2502(a). An individual is guilty of carrying a firearm without a license if he "carries a firearm concealed on or about his person . . . without a valid and lawfully issued license[.]" 18 Pa.C.S. § 6106(a)(1). Except in circumstances not applicable here, "[n]o person shall carry a firearm . . . at any time upon the public streets" of Philadelphia. *See* 18 Pa.C.S. § 6108. Finally, "[a] person commits a misdemeanor of the first degree if he possesses any instrument of crime with intent to employ it criminally." 18 Pa.C.S. § 907(a).

[Appellant]'s conclusory statement that the videos do not include [him] is belied by the evidence. While it is true that the surveillance videos presented by the Commonwealth in its compilation were of varying resolution, the jury had ample basis to conclude that it was [Appellant] depicted in the video. In particular, the surveillance footage from a store near the crime scene showed a close-up image of the man who appeared to be identical to [Appellant] as he sat at counsel table. In addition, . . . the video compilation was largely corroborated by [Ms.] McKiver's testimony, in which she independently identified [Appellant] as the shooter. While some of [Appellant]'s features, such as his tattoos, a facial mole, and hairline, were obscured in the video compilation, Detective Kert Wilson, who was qualified at trial as an expert in video recovery and analysis, testified that it is common for facial features and tattoos to be less visible in surveillance videos.

In addition, [Appellant]'s assertion that the videos do not show [Appellant] carrying a firearm does not undermine the weight of the evidence. While the actual shooting was not captured on video, [Ms.] McKiver testified that she saw [Appellant] shoot [Mr.] Smith, and the video captured [Appellant] discarding something over a fence after the shooting in the exact location where police later recovered the murder weapon.

Finally, as to [Appellant]'s argument that [Ms.] McKiver was incredible, it is well-established that credibility determinations are solely within the province of the factfinder, and a court may not reweigh the evidence and substitute its judgment for that of the finder of fact. While it is true that [she] did not initially want to talk to police, [Ms.] McKiver testified at trial that she was afraid of [Appellant], with whom she was in a relationship, because [he] told her that he thought about killing her and she didn't want to be the next murder in [the neighborhood]. Additionally, [Ms.] McKiver also testified that she originally told police that a drug dealer named "D" killed [Mr.] Smith because [Appellant] repeatedly instructed her to do so following the murder.

Furthermore, while some details of [Ms.] McKiver's testimony were inexact, including where exactly [Mr. Smith] was shot on his head and whether [Appellant] grabbed her while running away, her independent recollection of what happened on the day of the shooting was largely corroborated by surveillance video from the area of the shooting. [She] had never seen the Commonwealth's

- 7 -

compilation video prior to testifying. Even so, [Ms.] McKiver was able to recall that she was with [Appellant] prior to the murder, that [Mr.] Smith went to the store to get a lighter, that she dropped her phone while running away from Salem Street, that [Appellant] followed her while she ran away from Salem Street, and that [Appellant] had thrown the gun he used to kill [Mr.] Smith, all of which was captured on video.

*Id*. at 12-14 (cleaned up).

Our review of the certified record confirms the court's findings. Plainly, the jury was permitted to credit Ms. McKiver's in-court identification of Appellant as the shooter over her initial statement that another individual murdered Mr. Smith. It heard her explanation for why she changed her story and slowly divulged more details about the shooting, and could assess for itself which version of events it deemed credible.

Furthermore, it was the jurors' duty to deduce whether it was Appellant whom they viewed in the surveillance footage approaching the shooting, throwing an item over a fence immediately after the shooting, and running away with Ms. McKiver thereafter. Their review led them to conclude that the individual depicted was the person sitting in judgment in front of them. The compilation portrayed Appellant walking on the streets of Philadelphia with no firearm present. However, when Ms. McKiver first observed him, he lifted his arm, gun in hand, and shot Mr. Smith. It was wholly within the jury's province to infer that Appellant was concealing a firearm on his person before using it to shoot Mr. Smith.

Finally, it is beyond cavil that DNA evidence is not required to convict an individual. *See Commonwealth v. Rivera*, 828 A.2d 1094, 1104

(Pa.Super. 2003) (reiterating that in homicide cases, "the absence of a weapon, blood[,] or DNA is not fatal to the Commonwealth's case, nor is the lack of eyewitnesses; the *corpus delicti* may be established by circumstantial evidence"). Here, the record reveals that there was ample eyewitness testimony and circumstantial evidence for the jury to convict Appellant of murdering Mr. Smith and concealing a firearm on his person on a Philadelphia street.

Based on the foregoing, we conclude that the trial court did not abuse its discretion in determining that the jury's verdict was not against the weight of the evidence. Accordingly, we affirm Appellant's judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 1/10/2025