**COMMONWEALTH of Pennsylvania,**
**Appellee**

v.

**Tex Xavier ORTIZ, Appellant**

**No. 253 WDA 2016**

Superior Court of Pennsylvania.

Argued February 21, 2017
Filed April 20, 2017

Victoria H. Vidt, Public Defender, Pittsburgh, for appellant.

Rebecca G. McBride, Assistant District Attorney, Pittsburgh, for Commonwealth, appellee.

BEFORE: GANTMAN, P.J., BENDER, P.J.E., and MOULTON, J.

OPINION BY BENDER, P.J.E.:

Appellant, Tex Xavier Ortiz, appeals from the judgment of sentence of an aggregate term of 8–22 years' incarceration, imposed following his convictions for kidnapping of a minor and interference with custody of a child (hereinafter, "ICC"). Appellant contends that there was insufficient evidence to support his kidnapping conviction and, as a result, we must reverse the order subjecting him to a lifetime registration requirement under SORNA.[1] Alternatively, Appellant challenges the discretionary aspects of his sentence. After careful review, we reverse Appellant's conviction for kidnapping as well as the corresponding SORNA order, vacate Appellant's sentence for ICC, and remand for resentencing.

The evidence presented at trial established that [Victim], born [in July of] 2012 (two and a half years of age at the time of the events in question), is the daughter of Larae Clark and [Appel-

---

1. Sexual Offender Registration and Notification Act, 42 Pa.C.S. §§ 9799.10–9799.41.

lant]. On October 20, 2014, Larae Clark passed away and [Appellant] became a single father to [Victim]. After Larae's death, her mother Lori Clark ( [Victim]'s grandmother) cared for [Victim] several days a week. In December, 2014, Lori Clark became concerned for [Victim] for various reasons including [Appellant]'s placement on electronic monitoring on an unrelated parole matter and the presence of drug paraphernalia in his home as observed by [Appellant]'s parole officer and Ms. Clark's ex-husband. On December 16, 2014, Ms. Clark filed a Petition for Custody in the Family Division of this Court and went to [Appellant]'s home with her niece, LaToya McClendon, the same day[,] to give him notice of the upcoming hearing on December 19, 2014. When [Appellant] was not home, Ms. McClendon took the custody [p]etition and returned to [Appellant's] home the next day, December 17, 2014, when she saw and spoke to [Appellant] and served him with a copy of the custody [p]etition.

On December 18, 2014, [Appellant] texted Ms. Clark and told her that [Victim] had already been taken to New York.

Despite having been given notice of the hearing by Ms. McClendon, [Appellant] did not appear at the custody hearing on December 19, 2014. At that hearing, Judge Tranquilli of the Family Division of this Court entered an [order] granting Ms. Clark interim primary physical and legal custody of [Victim]. Following the entry of the [o]rder, Ms. Clark took [it] to the Wilkinsburg Police Department, where [Appellant] lives[,] and then attempted to locate [Appellant] and [Victim] on her own. She texted [Appellant]'s sister, Jennifer, who lives in New York, and asked her to tell [Appellant] that the custody order was in place and to send [Victim] back. On December 22, 2014, when Ms. Clark had not received a response, she contacted the Penn Hills Police Department where she lived, and asked for their assistance. Officer Patrick Ford of the Penn Hills Police Department called [Appellant] multiple times and left a voice mail regarding the custody order. [Appellant] called Officer Ford back and told him that [Victim] was safe in New York, that no one was going to get her[,] and that he didn't care about the custody order. The same day, Detective Hamlin[,] from the Wilkinsburg Police Department[,] forced entry into [Appellant]'s home and[,] while no one was there, he found signs of recent activity including lights and a television on and a computer with the internet up. [Appellant]'s electronic monitoring ankle bracelet had been cut off and was later found in the yard of a neighbor's home.

Thereafter, the Allegheny County Child Abduction Response Team was activated with assistance from the FBI. On January 5, 2015, after an extensive investigation in Pennsylvania and New York, [Appellant] was located at a Residence at 146 Third Avenue in Altoona, Pennsylvania. The residence was surrounded by [more than 30 local and state police officers]. As the residence was near a school, the students were held inside the building. A hostage negotiator was able to make contact with [Appellant] and was eventually able to convince him to release [Victim] and surrender peacefully. [Victim] was taken to Children's Hospital in Pittsburgh where she was found to be uninjured.

Trial Court Opinion, 9/8/16, at 2–4.

Based on these events, Appellant was charged with kidnapping of a minor, 18 Pa.C.S. § 2901(a.1)(2) ("kidnapping"); concealment of the whereabouts of a child, 18 Pa.C.S. § 2909; and ICC, 18 Pa.C.S.

§ 2904. Following a jury trial held on May 18–21, 2015, Appellant was found guilty of kidnapping and ICC, but not guilty of concealment of the whereabouts of a child. On September 14, 2015, the trial court sentenced Appellant to 6–18 years' incarceration for the kidnapping offense, and a consecutive term of 2–4 years' incarceration for ICC. Additionally, due to his kidnapping conviction, Appellant was ordered to comply with SORNA's lifetime registration requirement. *See* 42 Pa.C.S. § 9799.15(a)(3) ("An individual convicted of a Tier III sexual offense shall register for the life of the individual."); 42 Pa.C.S. § 9799.14(d)(1) (designating 18 Pa.C.S. § 2901(a.1) as a Tier III sexual offense).

Appellant filed a timely a post-sentence motion, which was denied by operation of law on January 19, 2016. Thereafter, Appellant filed a timely notice of appeal on February 18, 2016, and a timely, court-ordered Pa.R.A.P. 1925(b) statement on July 20, 2016.[2] The trial court issued its Rule 1925(a) opinion on September 8, 2016.

Appellant now presents the following questions for our review:

I. Was the evidence presented at trial insufficient to support the conviction of [k]idnapping as [Appellant], [Victim's] father, did not remove [Victim] in order to facilitate the commission of any felony or flight, he did not hold [Victim] for ransom, cause her injury, or terrorize [Victim]; rather, [Appellant] acted out of affection by taking his child away from [her] grandparents, in order to continue his custody of her? Is not the more appropriate crime in this instance [ICC]?

II. Is the [o]rder requiring lifetime registration as a sex offender under SORNA erroneous in that, assuming the [k]idnapping conviction is reversed, [Appellant] would not be a Tier [III] offender?

III. Is the sentence imposed manifestly excessive and an abuse of the trial court's discretion in that [Appellant]'s sentence was either above the guideline ranges or in the aggravated range of the guidelines and no contemporaneous written statement for sentencing in the aggravated range or sentencing outside the guidelines was given, nor was [Appellant] informed of the guideline ranges in open court; moreover, the sentencing court failed to comport with the dictates of the Sentencing Code, 42 Pa.C.S. § 9721(b)[,] in considering not only the gravity of the offense but also the protection of the public and the rehabilitative needs of [Appellant]?

Appellant's Brief at 6.

■ We begin with Appellant's sufficiency challenge. Appellant argues that the Commonwealth failed to prove by sufficient evidence the *mens rea* element of kidnapping applicable in this case. Our standard of review for addressing sufficiency-of-the-evidence claims is well-settled:

A claim challenging the sufficiency of the evidence is a question of law. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt.

---

**2.** The trial court notes that the time gap between the filing of the notice of appeal and the filing of Appellant's Rule 1925(b) statement was due to a delay in the filing of the trial transcripts and that Appellant acted diligently by requesting multiple extensions of time to file his statement, each of which was granted by the court. *See* TCO at 2 n.4.

Where the evidence offered to support the verdict is in contradiction to the physical facts, in contravention to human experience and the laws of nature, then the evidence is insufficient as a matter of law. When reviewing a sufficiency claim[,] the court is required to view the evidence in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence.

*Commonwealth v. Widmer*, 560 Pa. 308, 744 A.2d 745, 751 (2000) (internal citations omitted).

Kidnapping of a minor is a separate, self-contained crime found within the more general kidnapping statute, 18 Pa.C.S. § 2901. That provision reads as follows:

**(a.1) Kidnapping of a minor.**—A person is guilty of kidnapping of a minor if he unlawfully removes a person under 18 years of age a substantial distance under the circumstances from the place where he is found, or if he unlawfully confines a person under 18 years of age for a substantial period in a place of isolation, with any of the following intentions:

(1) To hold for ransom or reward, or as a shield or hostage.

*(2) To facilitate commission of any felony or flight thereafter.*

(3) To inflict bodily injury on or to terrorize the victim or another.

(4) To interfere with the performance by public officials of any governmental or political function.

18 Pa.C.S. § 2901(a.1) (emphasis added).

In this appeal, Appellant does not dispute the Commonwealth's proof at trial of the non-intent based elements of kidnapping of a minor set forth in the main paragraph of Section 2901(a.1). Notably, despite some ambiguity in the trial court's Rule 1925(a) opinion,[3] as well as the charge given to the jury,[4] the Commonwealth concedes the jury's verdict was not premised upon subsections (1), (3), or (4) of Section 2901(a.1). Appellant was specifically charged under Section 2901(a.1)(2) in the criminal complaint, *see* Criminal Complaint, 12/23/14, at 3, as well as in the criminal information, *see* Criminal Information, 2/25/15, at 1 (Count 1). And, as correctly noted by the Commonwealth, both the verdict slip and sentencing order in this case indicate that Appellant was convicted solely, and specifically, of the kidnapping offense defined under Section 2901(a.1)(2). *See* Commonwealth's Brief at 22. After careful review of the record, we agree with the Commonwealth. Accordingly, we will only examine Appellant's sufficiency claim with respect to whether the Commonwealth presented sufficient evi-

**3.** The trial court cited subsection (a.1)(2) on the first page of its Rule 1925(a) opinion. TCO at 1 n.1. However, in its analysis of Appellant's sufficiency issue, the court only cited subsection (a.1)(4), *id.* at 5, and the analysis itself is oddly ambiguous as to which subsection the trial court deemed the evidence sufficient to support. *Id.* at 5–7.

**4.** As the Commonwealth correctly notes in its brief, the jury was only initially charged by the trial court, verbally, with the non-intent elements of Section (a.1), and not with any of the intent elements set forth in Sections (a.1)(1)–(4). N.T., 5/18/15–5/21/15, at 303–04.

Subsequently, when the jury requested a recharge "on all of the charges," *id.* at 311, the court did not recharge the jury on the elements of any of the offenses before the jury, *id.* at 311–19, although this appears to be because the jury answered "no" when the court asked whether the jury wanted an oral recitation of the elements of the offenses. *Id.* at 319. The court did indicate, however, that such information had been provided to the jury in writing. *Id.* Nevertheless, the certified record does not contain the written charges that were provided to the jury during their deliberations.

dence as to subsection (a.1)(2), that is, whether the Commonwealth proved that Appellant unlawfully removed Victim from her legal custodian, with the intent to "facilitate commission of any felony or flight thereafter." 18 Pa.C.S. § 2901(a.1)(2).

In arguing that no such intent was demonstrated in this case, Appellant relies substantially on *Commonwealth v. Barfield*, 768 A.2d 343 (Pa. Super. 2001). Appellant contends that "*Barfield* is directly on point—holding that the crime of kidnapping is generally *not* applicable to the usual circumstance where a parent removes a child in contravention of a custody order." Appellant's Brief at 19. In this regard, Appellant avers that the evidence, at most, proved his intent to retain custody of his own child, which, while sufficient to support a conviction for ICC, did not suffice to show his intent to "facilitate commission of any felony or flight thereafter." 18 Pa.C.S. § 2901(a.1)(2). In rejecting Appellant's sufficiency claim, the trial court states that Appellant

was given notice of the custody hearing and subsequent [custody] [o]rder and indicated that he did not care. He also stated that the child had been taken out of the Commonwealth to avoid turning her over to her grandmother. He cut off his electronic monitoring ankle bracelet and engaged numerous police departments, the Allegheny County Child Abduction Response Team and the FBI in a multi-state investigation lasting two (2) weeks which eventually led to a SWAT team and hostage response and caused a nearby school to go into lock-down.

TCO at 5. The trial court then goes on to distinguish this case from the circumstances at issue in *Barfield. Id.* at 5–7.

In *Barfield*, a court entered a custody order placing Barfield's children in the custody of the Lancaster County Children and Youth Agency ("LCCYA"). LCCYA then placed the children in foster care. Barfield later attempted to regain custody of her children, but the court denied her request. However, she was permitted unsupervised weekend visits with the children. After obtaining physical custody of them during the first scheduled visit, just a week later, Barfield failed to return her children to their foster mother on the scheduled date.

The day after she was scheduled to return the children, Barfield notified the LCCYA caseworker

that the children were fine and that they had been taken into the custody of Provident Embassy World Religions and that [LCCYA] would receive an order overruling its custody order. Once this occurred, [Barfield] indicated that she would return to Lancaster. [Barfield] left similar messages for the caseworker stating that [Barfield] had taken the children on her own, that [LCCYA] no longer had jurisdiction, and that eventually [Barfield] planned on coming back to Lancaster.

The caseworker contacted the Lancaster City Police and a warrant was subsequently issued for [Barfield's] arrest. *Barfield*, 768 A.2d 343, 344 (Pa. Super. 2001) (quoting from the trial court's opinion). Barfield was found and arrested. Tragically, however, Barfield's children were never found. *Id.*

Barfield was charged with two counts of kidnapping, and two counts of ICC. Although a jury returned guilty verdicts on all counts, the trial court subsequently granted Barfield's motion for judgment of acquittal on both kidnapping counts. The Commonwealth appealed, and the sole question before the *Barfield* Court was "whether the trial court erred as a matter of law in determining that § 2901(a)(4) of the kidnapping statute was not intended to address a situation where a non-custodial

parent removes her children from the custody of a social service agency in violation of a court ordered placement plan?" *Id.*

The *Barfield* Court reviewed the legislative history of the ICC statute, including the relevant Model Penal Code provision from which it was taken, and concluded that

> in promulgating § 2904 [ (ICC),] Pennsylvania followed the lead of the Model Penal Code and *removed from the general crimes of kidnapping the special case of custodial interference*. The rationale that is offered to support this special treatment is twofold. First, "the interest protected is not freedom from physical danger or terrorization by abduction, [since that is adequately covered by § 2901], ... but rather the maintenance of parental custody against all unlawful interruption...." ALI, Model Penal Code and Commentaries, Part II § 212.4, comment 2(a). The conduct is further distinguishable from kidnapping by the fact the defendant is usually a parent or other relative who is favorably disposed toward the child and does not think of his action as harmful to the child. *Id.* Thus, a less severe sanction for this type of conduct is warranted. Clearly the drafters of our present Crimes Code intended to differentiate between the varying types of unlawful removal and restraint based upon the degrees of harm potentially involved with such actions.

*Id.* at 347–48 (footnote omitted) (emphasis added). On this basis, the *Barfield* Court held that the trial court "correctly determined the conduct engaged in by [Barfield] did not support a finding [that] she violated the proscribed purpose contemplated by subsection (4) of § 2901(a)." *Id.* at 348.

In *Commonwealth v. Rivera*, 828 A.2d 1094 (Pa. Super. 2003), another case involving an abduction by a biological parent, this Court reached a different conclusion based on distinguishable facts. In that case, Rivera had a child with Jennifer Helton. Even before the child was born, Rivera began beating Helton. After the child's birth, Helton sought refuge with her parents to escape from the abuse, and she also obtained a protection from abuse order against Rivera. That order granted Helton sole custody of the child, and only allowed Rivera supervised visits. Following a hearing related to assault charges filed by Helton against Rivera, "Rivera confronted Helton at a local convenience store. In the parking lot, he beat her and dragged her by her hair and throat." *Rivera*, 828 A.2d at 1096. When a passerby intervened, Rivera fled, and immediately went to their child's daycare facility, broke in, and abducted the child. He then drove around with the child, and made a series of telephone calls to Helton and others, demanding "to meet with Helton and threatened her that if she refused she would never see the child again." *Id.* at 1096. When he was finally apprehended, Rivera no longer had their child, claiming that he had given her to a woman in a nearby community. While in prison, Rivera told a different story, admitting to another inmate that he had suffocated his daughter and then concealed her body in an unmarked grave. Rivera also tried to get the other inmate to participate in a scheme to frame a prior acquaintance of Rivera, the man who owned the property where the child was supposedly buried. The child was never found, but circumstantial evidence discovered by authorities supported Rivera's jailhouse confession that he had murdered the girl. Rivera was ultimately convicted of second degree murder, kidnapping, burglary, and ICC.

On appeal, relying on *Barfield* and similar authorities, Rivera argued that there

was insufficient evidence supporting his conviction for kidnapping because "it is impossible for a parent to kidnap his own child." *Id.* at 1098. This Court rejected Rivera's claim for several reasons. For instance, his claim was drastically overstated, as the *Rivera* Court found that neither applicable case law, nor the kidnapping statute itself, contained any categorical bar against convicting a biological parent of that offense. *Id.* at 1101. With respect to *Barfield* specifically, this Court recognized the validity of that decision, and expressly adopted its rationale. *Id.* Indeed, the *Rivera* Court stated that "not only does *Barfield* fail to support Rivera's claim [on the facts], it also sets out a reasoned analysis of why Rivera's conduct is punishable under the kidnapping statute." *Id.* at 1100. Unlike what had occurred in *Barfield*, "Rivera's purpose was to seize his daughter and proceed to threaten danger and death upon her in an effort to coerce, manipulate and terrorize her mother. The facts of this case present far more than mere 'interference' with custody." *Id.* at 1100–01. The Court further explained that "the [ICC] statute is not the only law that applied to Rivera's conduct because in addition to removing his daughter in contravention of a court order, he removed the child with the intent to harm or terrorize her mother." *Id.* at 1101.

Instantly, Appellant contends this case is most analogous to *Barfield*, and that the foundational logic of the *Barfield* decision applies even more so here, given that Barfield's children were never seen again, whereas Appellant's child was returned to her lawful custodian, unharmed, after only 13 days. Appellant also distinguishes this matter from the situation which occurred in *Rivera*:

While *Rivera* does stand for the proposition that a parent is *not* automatically exempted from the kidnapping statute when absconding with a child, the facts of *Rivera* are much more egregious than what happened here. The child in *Rivera* was killed. She was driven around with the specific intent to terrorize her mother. Rivera had never had custody of the child, and in fact was under a PFA order to keep away from her except in very limited circumstances.

In contrast, [Appellant] had valid legal custody of his daughter. He was then confronted with his deceased baby-mama's [*sic*] parents who had first been supportive but then decided he was not a fit parent for his child. The grandparents took [Victim] from her home without permission and also took her clothes and items from their dead daughter. [Appellant] confirmed that he had custody as the birth father, and wished to remain a devoted parent to his legal girl. But the grandparents then came and watched his home late at night. ... In fear of losing his daughter, [Appellant] acted to maintain custody, not to harm anyone. While taking [Victim] to Altoona may not have been the best response to the events at hand, admittedly, taking off with [Victim] was not done with the intent to interfere with government functions. Instead, it was an act of love done to keep his daughter with him. [Victim] was not harmed during this short time away, and she has been returned to safety. There was no intent to terrorize. The more accurate crime here is [ICC], not kidnapping. ...

Simply put, this not the egregious case of *Rivera*, nor is it even as bad as *Barfield* where the biological mother took the children away and they never returned.

Appellant's Brief at 26–27 (emphasis in original).

The Commonwealth argues, however, that sufficient evidence did support Appellant's conviction pursuant to 18 Pa.C.S. § 2901(a,1)(2). Here, the Commonwealth claims, Appellant's 'intent' was to facilitate the commission of a felony. Specifically, the Commonwealth attempts to reframe Appellant's issue on appeal as "whether ICC can be a felony offense that supports a conviction for Kidnapping." Commonwealth's Brief at 23. While acknowledging the continued validity of *Barfield*, the Commonwealth asserts that the reasoning of that case nevertheless "demonstrates [k]idnapping by a parent and [ICC] are separate and distinct offenses. A defendant can be guilty of both crimes if the defendant's actions meet the elements of the crimes." *Id.* at 27.

Under this view, the Commonwealth argues that

the evidence revealed that Appellant's purpose was to take [Victim] away from Ms. Clark and prevent her from having custody of [Victim]. The Commonwealth's evidence proved that Appellant knew he no longer had custody of [Victim] as of December 19th, and his purpose in [k]idnapping [Victim] on December 22nd was to interfere with the police enforcing the custody order. There is no question he committed the felony offense of [ICC], and he has not challenged his conviction for that offense on appeal. Preventing Ms. Clark from having [Victim] was the reason he [k]idnapped [Victim]. For two weeks, he removed [Victim] a substantial distance from Ms. Clark's residence in Pittsburgh. Through an extensive police investigation, Appellant and [Victim] were eventually located on January 5th in Altoona, PA. Given these unique set of facts, it is the position of the Commonwealth that the evidence proved Appellant violated 2901(a.1)(2) and his case is not comparable to *Barfield*.

Commonwealth's Brief at 30–31.

To begin our analysis, we must first address a factual dispute between the parties, one which is certainly relevant to the Commonwealth's position although, perhaps, less so to Appellant's. It is clear that the parties disagree on whether Appellant was aware, when he absconded with Victim, of the custody order and its contents. After careful review of the record, we must conclude that sufficient evidence existed to allow the jury to find that Appellant was aware of it. During both direct and cross-examination, Officer Ford testified that he told Appellant about the custody order over the phone. N.T., 3/3/15, at 97; 101–02. Officer Ford specified that Appellant "said he knows about the custody order and [that] he does not care." *Id.* at 102. There was some evidence to the contrary, such as Appellant's testimony at trial, during which he admitted to having the conversation with Officer Ford, but stated that he was skeptical of whether Ford was a police officer, or merely part of scheme by Victim's grandparents to trick him into handing over custody. N.T., 3/3/15, at 212–13.[5]

---

5. Regarding the initial text messages from Officer Ford, Appellant testified that, in his mind, he was "thinking this is just another one of the Grandma['s] or Grandpa's antics to try to persuade me to give my daughter to her, because there [were] no police officers knocking on my door." *Id.* at 212. He said he was still under the same impression when he spoke to Officer Ford over the phone soon thereafter, especially given his observation of the grandparents in the vehicle, outside of his house, around the same time he was speaking to Officer Ford. *Id.* at 212–13. Appellant said that, in order to avoid having a "tug-of-war" over his daughter with the grandparents, and given the lengths to which he believe they were willing to go to secure Victim, he absconded with Victim at that time. *Id.* at 213.

We agree with Appellant that the evidence regarding his knowledge about the custody order was not ironclad. While Appellant was certainly made aware of the order by his own admission, his defense that he did not believe that it was real was not directly or strongly contradicted by any specific evidence. Nevertheless, it was for the jury to determine whether Appellant's account of events was credible and, in that regard, we must conclude that sufficient evidence existed for them to reject the portions of his testimony in which he claimed to be suspicious of Officer Ford.[6] *See Widmer*, 744 A.2d at 751 ("When reviewing a sufficiency claim[,] the court is required to view the evidence in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence."); *see also Commonwealth v. Yasipour*, 957 A.2d 734, 745 (Pa. Super. 2008) (stating "the finder of fact is free to believe some, all, or none of the evidence presented").

Nevertheless, we ultimately agree with Appellant that this case bears a stronger resemblance to *Barfield* than it does to *Rivera*. In all three cases, the defendants were aware, or should have been aware, that they had acted in defiance of a lawful custody order which effectively prohibited their conduct. The key issue which distinguishes *Barfield* from *Rivera* is whether the intent to retain custody or, correspondingly, the intent to maintain the existing bond with the child, was the sole basis for the abduction. In *Rivera*, sufficient evidence was presented to demonstrate that Rivera had abducted his own child, not for the benefit of maintaining the status quo of their relationship, but in order to terrorize another individual.[7] Any doubts as to Rivera's intent, however, were dispelled when it was also proven by sufficient evidence that he had murdered the child.

In *Barfield*, by contrast, despite the failure of authorities to locate the missing children, there was still not sufficient evidence to show that Barfield had acted with intent beyond a desire to protect or maintain custody of the children. Moreover, in *Barfield*, the relevant intent provision of the kidnapping statute was whether Barfield had acted with the intent to "interfere with the performance by public officials of any governmental or political function." *Barfield*, 768 A.2d at 345 (quoting 18 Pa. C.S. § 2901(a)(4)). Viewed from a perspective ignorant of the existence of the ICC statute, it would appear that Barfield's conduct did, in fact, interfere with the duties of the caseworkers managing her children's custody matter, with the police who tried to secure their return, and/or with the judge who had issued the custody order in the first place. Nevertheless, the *Barfield* Court concluded that, when considered in relation the crime of ICC, such interpretations would effectively undermine the legislature's effort in crafting the ICC statute. As the *Barfield* Court explained:

> Whenever a custody order is in place and the non-custodial parent acts in contravention of that order the respective duties of the assigned caseworker and judge are certainly affected. Undoubtedly, such activity is frowned

---

6. While there was some other evidence regarding Appellant's knowledge of the custody order, we deem it unnecessary to analyze that evidence, as we conclude that the jury could have found evidence sufficient to establish Appellant's knowledge of the order based on these facts alone.

7. We also note that it appears that Rivera may have intended the abduction to assist in his flight from justice after having attacked the victim's mother, which is also inconsistent with, or at least additional to, his intent to maintain a relationship with that child.

upon; however, the legislature has seen fit to classify such conduct as a separate and distinct crime. *See* 18 Pa.C.S.A. § 2904. If we were to accept the Commonwealth's position then the crime of interference · with the custody of children would become superfluous. Clearly, the object to be attained by the legislature was just the opposite. Notwithstanding its similarity in some respects to kidnapping, the interest to be protected by § 2904 is distinct from that of § 2901. *See* A.L.I., Model Penal Code and Commentaries, Part II § 212.4, comment 2 (1980). While § 2901 does not explicitly exempt parents from criminal prosecutions for abducting their own children[,] we are not persuaded the legislature intended a parent to be prosecuted under subsection (4) and subject to its more severe penalty for the same conduct proscribed by § 2904(a). Of course, we are not suggesting there can never be a case where the circumstances coalesce to support a finding of the intent envisioned by subsection (4) where a parent abducts their child, only that this is not such a case.

*Id.* at 346 (footnote omitted).

We also note that in this case, as in *Barfield,* the biological parent initially held both lawful and actual custody of their children, but were subsequently deprived of lawful custody while still retaining physical custody. Neither Barfield nor Appellant took their children away from a lawful custodian in defiance of the court order. Rather, it was by retaining actual custody that they had defied the order. By contrast, in *Rivera,* the defendant did not merely retain actual custody in defiance of a change in legal status. Instead, he abducted his daughter at a time when he was clearly not permitted to visit with her. This circumstance also suggests that, in this case, the ICC statute, and not the kidnapping statute, is more appropriate given the nature of Appellant's conduct.

Turning to the Commonwealth's argument, we see no reason to depart from the *Barfield* Court's logic with respect to the intent element at issue in this matter, as set forth in 18 Pa.C.S. § 2901(a.1)(2). We recognize that:

> Whenever a general provision in a statute shall be in conflict with a special provision in the same or another statute, the two shall be construed, if possible, so that effect may be given to both. If the conflict between the two provisions is irreconcilable, the special provisions shall prevail and shall be construed as an exception to the general provision, unless the general provision shall be enacted later and it shall be the manifest intention of the General Assembly that such general provision shall prevail.

1 Pa.C.S. § 1933. Additionally, in the special case of criminal statutes, we must be "mindful of the rule of statutory construction which holds that penal statutes must be strictly construed in favor of the accused." *Commonwealth v. Cunningham,* 248 Pa.Super. 219, 375 A.2d 66, 67 (1977).

First, we note that Section 2901(a.1) was added to the general kidnapping statute by amendment in 2011, pursuant to omnibus legislation enacted in conjunction with SORNA. Consequently, it was enacted after the ICC statute. However, the Commonwealth offers no argument or evidence that, pursuant to 1 Pa.C.S. § 1933, the 2011 amendment adding Section 2901(a.1), by its very nature, or through other means of assessing legislative intent, represented "the manifest intention of the General Assembly that such general provision shall prevail" over the previously enacted special provision, ICC statute. Indeed, the 2011 amendment to Section 2901(a.1) was but one of numerous changes to Titles 18 (Crimes and Of-

fenses), 23 (Domestic Relations), 42 (Judiciary and Judicial Procedure), 44 (Law and Justice), and 61 (Prisons and Parole) contained in the act implementing SORNA. We ascertain no intent on the part of the legislature to specifically affect or override the ICC statute by the changes to the kidnapping statute, nor can we imagine a reason why the legislature would override the ICC statute without offering some indication that it was doing so, especially in light of our decision in *Barfield*.

Nevertheless, the Commonwealth contends that it has shown sufficient evidence that Appellant abducted Victim with the intent to commit a felony, namely, a violation of the ICC statute, begging the question of whether an ICC offense can be asserted in satisfaction of Section 2901(a.1)(2)'s intent element. We think this claim presents the same legal quandary as the *Barfield* Court considered with respect to Section 2904(a)(4). As in *Barfield*, adopting the Commonwealth's interpretation here would eviscerate the purpose and effect of the ICC statute, rendering those provisions irreconcilable.

However, an alternative and less destructive interpretation of Section 2901(a.1)(2) is to conclude that ICC must be excluded as a "felony" which can satisfy that intent element, but only in the narrow and specific circumstance where a defendant is the biological parent of the child addressed by the custody order in question. Pursuant to 1 Pa.C.S. § 1933, we conclude this is the most obvious and best way to maximize the effect of both statutes. The Commonwealth's interpretation, by contrast, sacrifices the effect of the ICC statute in order to maximize the effect of the kidnapping statute. We decline to adopt the latter approach.

Accordingly, for all the reasons stated above, we conclude that the evidence in this case was insufficient to establish Appellant's intent pursuant to Section 2901(a.1)(2). Accordingly, we reverse his conviction for kidnapping. Consequently, with respect to Appellant's second claim, we must also reverse the order imposing a lifetime registration requirement on him pursuant to SORNA, which was premised upon that conviction. Finally, we do not reach Appellant's third and final claim, as we may have disrupted the trial court's sentencing scheme. Thus, we vacate Appellant's ICC sentence and remand for resentencing for that offense.

Conviction for kidnapping *reversed*. SORNA order *reversed*. Conviction for ICC *affirmed*. Judgment of sentence *vacated*. Case *remanded* for resentencing. Jurisdiction *relinquished*.

Judge Moulton joins this opinion.

President Judge Gantman concurs in the result.