J-S55038-17

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| v. | : | |
| | : | |
| JAMONI T. ANDERSON, | : | |
| | : | |
| Appellant | : | No. 2076 MDA 2016 |

Appeal from the Judgment of Sentence August 2, 2016,
in the Court of Common Pleas of Dauphin County,
Criminal Division, at No(s): CP-22-CR-0001239-2015

BEFORE:    DUBOW, RANSOM, and STRASSBURGER,* JJ.

MEMORANDUM BY STRASSBURGER, J.:            **FILED OCTOBER 04, 2017**

Jamoni T. Anderson (Appellant) appeals from his August 2, 2016 judgment of sentence of six to 20 years of incarceration imposed after a jury convicted him of voluntary manslaughter.  We affirm.

The trial court offered the following summary of the facts underlying Appellant's conviction.

> On November 19, 2014, Maurice Geter ("[Decedent]") was shot in Apricot Alley; he was pronounced dead at the hospital later that evening.  [Decedent], a drug dealer, had been involved in some sort of argument with Tamir Williams ("Williams") and [Appellant], [who were] also drug dealers.  It's evident that multiple phone calls from [Decedent] to the phone that Williams [] carried played a part in his death.  Though the testimony is contradictory, we do know that [Decedent] placed three phone calls to number owned by Eddie Pena ("Pena").  Pena had left his phone with Williams and Williams answered the calls from [Decedent].  Some sort of argument ensued during which [Decedent] insulted Williams, possibly because Williams stole a customer of [Decedent].

*Retired Senior Judge assigned to the Superior Court.

Earlier that day, Kwane Cuff ("Cuff") and [Decedent] were driving to a local mall to purchase a kit to help Cuff pass a drug test. Cuff drove the two in his Ford Explorer. During the trip, [Decedent] was trying to reach Pena in order to purchase drugs. Cuff heard [Decedent] get very angry with whomever [*sic*] had answered Pena's phone (Cuff could tell it was not Pena). [Decedent] indicated that the person on the other end had called him a rat. The call ended and then [Decedent] called Pena's number again and began to question whomever [*sic*] answered. [Decedent] had Cuff park on Regina Street and told the person on the other end, whom he described as "some nut ass young boy named Mere" where they were. During the third call, [Decedent] told the other person "you ain't on Regina Street" and then instructed Cuff to drive away. Cuff described [Decedent] as being angry throughout the calls and threatening the person on the phone.

After leaving the mall, [Decedent] had Cuff take him to Jefferson Street. Cuff assumed they were going to fight whoever was on the phone, but [Decedent] just got out and walked up the street. During the course of the investigation Shaquan Jones ("Jones") revealed that he had called [Decedent] a day or two prior to the shooting and let [Decedent] know that he had found a gun and it was for sale. Jones was unable to sell the gun that day, but on the day of [Decedent's] death, [he] contacted [Jones] and asked to borrow the gun. [Decedent] came over to [Jones's] house on Jefferson Street to borrow the gun and at trial, Jones indicated that [Decedent] did not seem nervous; however, his statement to police indicated that [Decedent] seemed nervous or frightened that day and that he was preparing. Jones recalled that the gun magazine was fully loaded with six bullets at the time.

[Decedent] returned to Cuff's car and showed Cuff the gun he had just borrowed - a .380. Cuff recalled seeing four bullets in the chamber when [Decedent] checked it. [Decedent] called [Pena's] number again and told the person that he was on his way to his house now. Cuff drove [to Decedent's] house and parked in the alley as directed by [Decedent]. They waited in the car for about 10 minutes when [Decedent] pointed out some people coming towards them on foot and jumped out of the car. [Decedent] yelled "What's up?" to them and then the two men started shooting at [Decedent] and Cuff. Cuff had also jumped

out, but jumped back into the car when the shooting started. Cuff never saw or heard [Decedent] shoot his gun. After the shooting stopped, Cuff called for [Decedent] but ultimately found [Decedent] lying near the tires, shot. He rolled [Decedent] over and picked up the gun. Cuff did not know of any problems that [Decedent] might have had with either [Appellant] or co-defendant Williams.

Raylynnd Aldridge ("Aldridge") sold drugs to [Decedent], having met him through Pena, who also sold him drugs. Aldridge, [Appellant,] and Williams were all friends prior to this incident. Aldridge had been with Williams driving around the city, selling drugs and smoking. Earlier in the day, he had been with Pena, but he dropped Pena and a woman off at a hotel. Pena left his phone in the car for Aldridge to use to sell drugs.

While Aldridge and Williams were driving around, they received a call on Pena's phone from [Decedent]. Williams answered it and Aldridge recognized [Decedent's] voice and heard [Decedent] yelling at Williams - he thinks because Williams and not Pena answered the phone. Williams hung up; [Decedent] called back and started yelling again and Williams hung up again. Williams was laughing throughout these two calls. [Decedent] called back a third time and Williams put him on speakerphone. Aldridge heard a part of the conversation during which [Decedent] told Williams to bow down the next time they saw each other. Aldridge thought this was disrespectful and believed that Williams also thought it was disrespectful as Williams'[s] attitude changed following that comment. [Decedent] also threatened to beat up or shoot Williams but per Aldridge, Williams did not seem to take those threats seriously because he just giggled at them.

[Appellant] called looking for drugs and a ride home while Aldridge and Williams were driving around and while [Appellant] was in the car, [Decedent] called again and told them to meet him at 15th Street. Aldridge interpreted this as a threat/invitation to fight. Aldridge asked Williams if he wanted to fight [Decedent,] and Williams did[,] so Aldridge drove them there. Aldridge filled [Appellant] in on what was going on and [Appellant] said he was fine fighting [Decedent]. Aldridge did not know that Williams and [Appellant] both had guns.

- 3 -

They drove to 15th [Street] but were unable to find a parking spot so drove through an alley and parked on 14th Street. Aldridge saw [Decedent] getting out of an SUV when they drove by, but did not see who was driving the vehicle. The three of them walked up the alley towards 15th when they saw [Decedent] standing there and Aldridge saw a reflection of light off what he believed was a gun. Williams yelled "gun" and Aldridge turned and started walking back towards his car. Aldridge heard a single shot and then a volley of shots from behind him and glancing back saw [Appellant] and Williams shooting back at [Decedent]. [Appellant] and Williams followed him to the car and they got in[.] Once inside the car, [Appellant] made a comment to the effect of "I turned the beam on and I hit him." Then they drove to pick up Aldridge's friend Chave and drop [Appellant] off. Aldridge heard from [Appellant] that [Decedent] had stolen one of his drug customers. Aldridge had no intent to kill [Decedent] that day, nor had any conversation taken place between him, Williams, and [Appellant] that led him to believe they intended to kill him.

[Appellant] himself testified at trial. In 2014, he was a drug dealer and user. In May of that year he was robbed so he acquired a .40 caliber handgun from one of his clients. In August, he purchased a laser sight while with Williams, Pena and another acquaintance.

On the night in question, [Appellant] called Pena for a ride, but Aldridge answered the phone. Aldridge and Williams arrived shortly thereafter, picked him up, and drove to State and Apricot. Williams told him they were going to 15th Street, but they ended up driving straight to 14th Street. They stopped and Williams asked [Appellant] to walk with him. [Appellant] thought they were going to sell drugs to a house on that street where he had sold before. As they walked up over the hill, they saw a man with a truck, pointing a gun. [Appellant] heard Williams say something, and [Appellant] ran towards a red car. They used a PT Cruiser parked on a parking pad in Apricot Alley, but across 15th Street from the Explorer, which was facing the same direction as the Explorer[,] for cover.

[Appellant] heard multiple gun shots and with his eyes closed, he reached above the PT Cruiser and fired four to five shots over top of his head. Once he opened his eyes, he saw

- 4 -

Williams running back down the alley and he followed. His gun rebounded on the first shot and upon returning to the car, he discovered his laser sight had fallen off. Williams and Aldridge dropped [Appellant] off a few blocks away because he did not want to be with them anymore.

Later that night, [Appellant] found out that [Decedent] had been shot and killed on Apricot Alley. [Appellant] did not tell anyone about his involvement and returned the gun to person he had gotten it [from]. He asked his client about possibly burning the gun and so they did try to do that. [Appellant] expressed remorse and apologized to [Decedent's] family while on the stand.

[Appellant] acknowledged knowing Williams, but denied that he ever called Williams for help or back up that day. He denied knowing [Decedent] well enough to have any sort of problem with him and denied that this shooting was related to drugs or stealing customers. [Appellant] acknowledged that he made no attempt to leave the alley prior to shooting his gun, but said it was because he was scared since other people were shooting.

Jacquie Williams ("Jacquie"), a friend of Williams[], called him that night just to check in. During the call she mentioned reading about [Decedent]'s death. Later that evening, Williams came over and they talked about [Decedent's] death. Williams told her that he had gone over to fight [Decedent] since [Decedent] [w]as being disrespectful and provoking him to fight. Williams told Jacquie that [Decedent] had called him "a nut ass young bull." Williams also told her that he did not have a gun, but was there just for a fistfight. After Williams left, Jacquie called [Appellant] to ask what had happened. During that call[], Jacquie testified that [Appellant] said he shot [Decedent] for stealing his client. He told her that they walked up the alleyway and saw [Decedent] standing there with a gun so he started shooting and using his laser [sight], hit [Decedent]. Jacquie also testified that for about two weeks prior to this, [Appellant] was complaining about [Decedent's] stealing a client and [said] that he was looking for [Decedent]; however, she did not tell the police this in her prior statement.

Office Maurer responded to the scene and found [Decedent] lying on his back near the driver's side rear tire of the SUV underneath a street light. Cuff approached Officer Barrelet, another responder, and informed her that he had a gun that he had taken off of [Decedent's] body. When Officer Barrelet secured the gun, a .380, she noticed that it was not warm and she did not notice any odor that suggest it might have been recently fired. The gun could hold a maximum of seven bullets but there were only 5 bullets when she checked the gun.

As part of his duties, Investigator Kimmick processes crime scenes and evidence. He created a crime scene diagram after he responded to the scene. The crime scene showed that near the Ford Explorer were three projectiles. Further, surrounding the PT Cruiser, he found 13 .40 caliber cartridge cases. In a semi-automatic gun, the cartridge case is ejected out of the side of the gun, usually to the right. In examining the Ford Explorer, Investigator Kimmick found that more bullets hit the passenger side than the driver's side. His examination of the PT Cruiser revealed a bullet hole in the front windshield and two defects on the roof. All of the damage to the PT Cruiser was to the front of the vehicle. He did not find any evidence of bullet strikes to any area facing the front of the PT Cruiser either. [Decedent's] hands were not tested for gunshot residue.

A ballistics expert determined that the .40 caliber cartridges came from two separate .40 caliber guns. Further, he testified that a .38 caliber gun would not be able to discharge a .40 caliber bullet.

Det. John O'Connor interviewed Williams after he was picked up. Williams was read his *Miranda*[1] rights and Williams agreed to give a statement without a lawyer. Williams told Det. O'Connor that he went up the alley with someone but he was not the shooter; he did not see a gun on [Decedent] and once the other person started firing a pistol he fled back to the car. Williams confirmed that there had been a series of phone calls between him and [Decedent] that day.

Trial Court Opinion, 2/14/2017, at 1-8 (citations omitted).

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

Upon this evidence, the jury convicted Appellant of voluntary manslaughter, and the trial court sentenced Appellant as indicated above. Appellant timely filed a post-sentence motion, and timely filed a notice of appeal after the motion was denied. Both Appellant and the trial court have complied with Pa.R.A.P. 1925. On appeal, Appellant seeks this Court's review of the sufficiency of the evidence to sustain his conviction. Appellant's Brief at 4.

> A claim challenging the sufficiency of the evidence is a question of law. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Where the evidence offered to support the verdict is in contradiction to the physical facts, in contravention to human experience and the laws of nature, then the evidence is insufficient as a matter of law. When reviewing a sufficiency claim[,] the court is required to view the evidence in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence.

*Commonwealth v. Ortiz*, 160 A.3d 230, 233-34 (Pa. Super. 2017) (quoting *Commonwealth v. Widmer*, 744 A.2d 745, 751 (Pa. 2000) (internal citations omitted)).

The voluntary-manslaughter statute provides as follows.

**(a) General rule.**--A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by:

> (1) the individual killed; or

(2) another whom the actor endeavors to kill, but he negligently or accidentally causes the death of the individual killed.

**(b) Unreasonable belief killing justifiable.**--A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify the killing under Chapter 5 of this title (relating to general principles of justification), but his belief is unreasonable.

18 Pa.C.S. § 2503.[2]

Here, the jury was charged on the elements of murder in the first and third degrees as well as voluntary manslaughter. N.T., 5/18-19/2016, at 571-79. "The law in this Commonwealth has always been that a conviction for voluntary manslaughter will be upheld as long as the evidence is sufficient to show that the elements of murder were present." *Commonwealth v. Harner*, 546 A.2d 1241, 1242 (Pa. Super. 1988).

Our Supreme Court's decision in *Commonwealth v. Weston*, 749 A.2d 458 (Pa. 2000), is instructive. The Court offered the following summary of the evidence offered against Weston in that case.

Tyrone Weston's co-conspirator, Le-Le, was involved in an argument with Derwin Fowler, the decedent, about selling drugs at an abandoned house that the decedent regarded as his

---

[2] Appellant, the Commonwealth, and the trial court all discuss the sufficiency of the evidence to establish that Appellant was guilty of imperfect self-defense under subsection (b) of the statute. Appellant's Brief at 16; Commonwealth's Brief at 15; Trial Court Opinion, 2/14/2017, at 10-11. However, the docket indicates that Appellant was convicted for violation of subsection (a)(1) regarding a killing under intense passion. As we discuss *infra*, the evidence was sufficient to sustain Appellant's conviction under either subsection.

territory. The decedent and Le-Le argued outside the house. Following the argument, the decedent went inside the house, and sat down on a couch with a gun on his lap. Le-Le returned to the house with Weston [] at his side. [Weston], armed with a gun, entered the house and asked Le-Le, "which one was it?" The decedent stood up. Shots rang out and [Weston] was hit in the foot. [Weston] and Le-Le then shot the decedent to death. The other people at the property were able to get away and provided eyewitness testimony regarding the incident.

*Id.* at 459-60 (footnote omitted).

Our Supreme Court determined that the evidence was sufficient to establish that Weston committed voluntary manslaughter.

The evidence presented at trial established that [Weston] went to the location, armed with a gun in order to assist Le-Le, who was also armed with a gun. As noted by the trial court, the fact that the decedent shot first does not justify [Weston's] shooting the decedent to death after confronting him with a gun. … [E]ntering the property of another with a gun in hand to revenge a disagreement certainly supports the voluntary manslaughter verdict here; and indeed this same evidence could have easily supported a verdict of murder in the first degree since the intent to kill is plain.

*Id.* at 462 (citation and internal quotation marks omitted).

Similarly, the evidence in the instant case, viewed in the light most favorable to the Commonwealth, establishes that Appellant was angry with Decedent for stealing one of Appellant's "fiends" (*i.e.*, users who spend a lot on drugs, buying daily). N.T., 5/18-19/2016, at 281, 381. After he was picked up by Williams and Aldridge, Appellant agreed to go along with them to fight Decedent. *Id.* at 262. When Appellant and Williams confronted Decedent in the alley, Appellant himself used his laser sight and shot

Decedent. *Id.* at 277. After Decedent had been killed, Appellant acknowledged that he shot him for stealing the client. *Id.* at 380 ("He was like, yeah, I shot him. He stole my fucking fiend.").

As was the evidence in *Weston*, this evidence in this case is sufficient to establish that Appellant shot Decedent with malice and the specific intent to kill, which are the requirements for a first-degree murder conviction. *See*, *e.g.*, *Commonwealth v. Murray*, 83 A.3d 137, 151 (Pa. 2013) ("To obtain a first-degree [*sic*] murder conviction, the Commonwealth must demonstrate that a human being was unlawfully killed, the defendant perpetrated the killing, and the defendant acted with malice and a specific intent to kill." (citation and internal quotation marks omitted)). Thus, the jury could have convicted Appellant of first-degree murder.

Instead, the jury chose to convict Appellant of voluntary manslaughter. Our law allows such a verdict based upon "a combination of two factors: a realistic appreciation of the humanity of those who sit on our juries, and the legal concept that voluntary manslaughter is by definition a lesser offense than murder but one included within a murder indictment." *Commonwealth v. Penn*, 282 A.2d 233, 234 (Pa. 1971). We see no reason to disturb the jury's verdict.[3]

---

[3] Because the evidence supported a finding that Appellant himself murdered Geter, we need not consider his claim that he was not liable for Geter's death as Williams's accomplice.

We also reject Appellant's argument that the verdict cannot stand because the Commonwealth's evidence was "so unreliable and/or contradictory as to make any verdict thereupon pure conjecture." Appellant's Brief at 18 (citing ***Commonwealth v. Karkaria***, 625 A.2d 1167 (Pa. 1993)). This is not a case, such as ***Karkaria*** or ***Commonwealth v. Bennett***, 303 A.2d 220, 220 (Pa. Super. 1973), in which the Commonwealth's case was based upon the testimony of a witness whose testimony was so inconsistent as to be completely irreconcilable, and the jury would have had to guess which version of the story to believe.

Rather, the Commonwealth in the instant case provided several witnesses whose testimony supported the case against Appellant. Although the witnesses may have given inconsistent statements or had motives or histories that made their credibility questionable, the jury had the opportunity to observe the witnesses, to consider the reasons for the inconsistencies, and to contemplate all of these factors in weighing the evidence. The jury did not have to guess what happened, but rather considered the credibility of each witness and weighed the evidence as a whole. Thus, we see no reason to deviate from the rule that it is for the jury to believe all, part, or none of the evidence. ***See***, ***e.g.***, ***Commonwealth v. Patterson***, 940 A.2d 493, 502 (Pa. Super. 2007) (noting that a "mere conflict in the testimony does not render the evidence insufficient because it is within the province of the fact finder to determine the weight to be given

to the testimony and to believe all, part, or none of the evidence" (citation omitted)).

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/4/2017